UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | No. 2:08-CR-57 |
| | ) | Jordan/Inman |
| WILLIAM M. McCALL | ) | |

**REPORT AND RECOMMENDATION**

The defendant is indicted for conspiring to distribute, and conspiring to possess with the intent to distribute, 50 grams or more of methamphetamine. Although the court is not privy to all the evidence the United States might have against defendant, at the very least the United States has a sizable quantity of methamphetamine that was found in defendant's car, a quantity of methamphetamine subsequently discovered on defendant's person, and a presumably incriminating statement that defendant gave to the Johnson City Police. Defendant has filed a motion to suppress this evidence (Doc. 22), and a supplemental motion to suppress (Doc. 31), which were referred to the United States Magistrate Judge under the standing orders of this Court and pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on October 3, 2008.

Only two witnesses testified at the suppression hearing, both Johnson City Police Officers: Officer Mark Hollis, and Officer Patrick Muncey. Both officers were creditable witnesses and their respective testimonies are believed. Based upon the testimony of these two officers, the facts are as follows:

Hollis and Muncey are "drug interdiction officers" assigned to the traffic division of the Johnson City Police Department. Both were assigned to Interstate 26 within the city limits of Johnson City, and were given the responsibility of looking for evidence of illegal drug trafficking while enforcing the traffic laws. On May 15, 2008, at approximately 11:30 a.m., Officer Hollis initiated a traffic stop of defendant's vehicle.[1] Defendant stopped his car on the shoulder of I-26 alongside a guardrail, and Officer Hollis pulled up immediately behind. Officer Hollis' vehicle was equipped with a video camera which recorded all events from the commencement of the traffic stop through the arrest of the defendant. A clock or timer appears on the video recording, so the time and duration of every event can be easily ascertained.[2] Officer Hollis' vehicle was also equipped with audio-recording equipment, which could be activated by a switch on Hollis' belt. Officer Hollis activated that switch when he exited his car. The microphone was on Officer Hollis' person, and it transmitted the audio signals back to the recorder in his car. The microphone worked only intermittently, cutting in and out. Defendant's counsel at first seemed to suggest that there was something suspicious about the sporadic nature of the audio portion of the recording, but it was evident that the microphone simply was not working well, nothing more.

According to the timer on the video recording, Officer Hollis began walking up to the

---

[1]Defendant does not contest the legitimacy of the traffic stop, as a result of which the testimony during the hearing barely touched upon the reasons for the stop. However, the United States' response recites the reason for the stop: as Officer Hollis was driving his unmarked police car on I-26, he was passed by two cars going around 70-75 miles per hour, the second of which was a mere three feet behind the first. As a result of the proximity of the second car to the first, Officer Hollis stopped the second car for the offense of following too closely.

[2]The timer that appears on the recording reflects not only the hour and minute, but also the seconds. Breaking down a traffic stop into seconds is somewhat akin to the effort of medieval theologians to determine how many angels can dance on the head of a pin.

driver's side of defendant's car at 11:29.[3] Defendant already had his driver's license (a North Carolina license) ready to give to Officer Hollis. Defendant was very excited and talkative. He stated that he was "sorry;" that he knew that he was speeding; and that he was late for work. Defendant told Hollis that he was a self-employed construction worker and that he was on his way to Wytheville, Virginia to do some construction work. Officer Hollis told him that he was not stopped for speeding, but rather for following too closely. Hollis noticed that there was nothing in defendant's car that suggested that he was a self-employed contractor; there was no hard hat, no tools, no luggage, no lunch box.

In plain view on the back set of the car, which Officer Hollis immediately noticed, were two long guns. Hollis at first thought they were both rifles; in fact, one was a rifle and the other was a shotgun. Officer Hollis asked defendant about the guns, and defen-dant responded that he had just purchased them from a friend in North Carolina. He volunteered that Officer Hollis could "run them," i.e., check to determine if they were stolen, if he so wished.

Officer Hollis walked back to his car to start the citation process. Johnson City police officers are provided with "PDA's," Personal Digital Assistants. In other words, Officer Hollis had a hand-held computer. After all the relevant information is entered into the device, it will print out the traffic citation or warning, as appropriate. It was into this device that Officer Hollis began

---

[3] Between 11:28 and 11:29, defendant's car pulled to the side of the interstate in obedience to Officer Hollis' blue lights. Some might argue (including defendant herein) that the traffic stop therefore commenced at 11:28, and the duration of the traffic stop should be calculated using that as the beginning time. This magistrate judge chooses to utilize 11:29 as the commencement of the traffic stop, since that is the time that Officer Hollis exited his car and began walking towards defendant's vehicle. After all, the officer must be allowed some time to consider the situation which he potentially confronts, and to relate his circumstances to his dispatcher. Usually, the tag number on the car is communicated to the dispatcher.

entering the information he needed to issue a citation to defendant. Hollis intended to issue defendant only a warning citation. As he walked back to his car, at slightly before 11:31, Officer Hollis called Officer Muncey requesting backup assistance due to the presence of firearms in the car. His request for assistance was a matter of routine precaution; he called for backup assistance every time firearms were in a car stopped by him, even if the owner of the vehicle had a concealed carry permit. Respectfully, that does not seem to be an unreasonable precaution.

At 11:32 and some seconds, Officer Hollis walked back to defendant's car and told him to drive forward beyond the guardrail, since the place they were parked was somewhat hazardous.[4]

At 11:34, Hollis approached defendant's car with his PDA in hand. Because defendant's driver's license did not include his Social Security number, Officer Hollis was obliged to ask defendant for it, which he did at 11:35, and he keyed in that information.

At this point, Hollis again asked defendant were he was going, and defendant responded that he was going on vacation. Hollis immediately remarked that only a few minutes earlier defendant had said that he was on his way to a construction job in Wytheville, Virginia**.** Defendant then said that he was going on a "working vacation." Officer Hollis testified that there was "something wrong with this picture." Defendant was nervously chatty; within the space of a few minutes he gave two conflicting versions of the purpose of his trip; and nothing in his vehicle

---

[4]By his questioning of Officer Hollis, defendant's counsel suggested that Officer Hollis really had no concern about the firearms in the rear seat since he allowed the driver to move his car with those guns in the back seat. That point is lost upon this magistrate judge. There was nothing patently illegal about either of the weapons, and it is not unlawful to transport weapons in a car. But the fact that there was nothing apparently illegal about the weapons would not conclusively indicate that they could not have been used against Officer Hollis. Certainly, he had no way of knowing. Thus, he never took his eyes off defendant for more than a few seconds.

suggested that he was a self-employed contractor on his way to do a construction project. Nevertheless, he intended to give defendant nothing more than a warning citation.

At 11:36, the PDA began printing out the warning citation. At 11:38, Officer Muncey arrived, and at 11:39, Officer Hollis is heard to tell Muncey that defendant had two rifles in the back of his car, and he did not know if there were any other guns in the car, or not. Still within the thirty-ninth minute of the eleven o'clock hour, Hollis walked back to the driver's side of the car to return defendant's license to him, and to give him his warning citation. Muncey stood at the passenger side of the car during this time. As Officer Hollis handed the driver's license and warning citation to defendant, Hollis ex-plained to defendant that there was nothing he needed to do with reference to the citation. At this time, Hollis again brought up the subject of the guns, and he reminded defendant of his statement that Hollis could "run the guns." Defendant agreed, and Hollis told defendant to get out of the car so that Hollis could get the guns and obtain from them the information he needed to determine if they were stolen. Muncey accompanied defendant to the rear of the car. Officer Hollis first told defendant that he needed to conduct a pat-down search of defendant for officer safety, and he did so. Nothing was discovered in this rather cursory pat-down search. Officer Hollis then walked back to defendant's car to retrieve the guns in order to obtain the serial numbers; he called in those serial numbers at approximately 11:42 :37.

*Sometime between 11:40 and 11:42:37, Hollis asked defendant for his consent to search the vehicle.* Defendant exited his car at 11:40, and Officer Hollis replaced the guns in the backseat of the car at 11:43:27. It was some time between defendant getting out of his car and Hollis replacing the guns in the backseat that defendant gave his consent to search the car. There is no need to go

into detail regarding Hollis' request for permission to search the car, and defendant's ultimate consent. It is sufficient to say that defendant knowledgeably and voluntarily consented to a search of his car between 11:40 and 11:43:27.

Hollis testified that as far as he was concerned, defendant was free to leave at approximately 11:40, i.e., after he had given defendant the warning citation and the ex-planation for it. Officer Hollis acknowledged that he did not tell defendant that he was free to go, and of course the court has no way of knowing whether defendant knew (or believed) he was free to go or not, since he did not testify. In any event, it bears repeating that defendant's consent to search the car was knowing, knowledgeable, and voluntary.

Officer Hollis started his search of the car at the backseat, at 11:44, which required approximately three minutes. At 11:47, he started searching in the driver's seat area. At 11:48 on the video recording, Officer Hollis is seen walking back to his car to get a pair of latex gloves, since by that time he had discovered what he reasonably believed to be methamphetamine.

It is appropriate to pause the factual recitation at this point to discuss defendant's argument that the traffic stop exceeded the time reasonably necessary to effectuate the purposes of the stop. A traffic stop must not last any longer than is necessary to consummate the official business required by the traffic offense. *See, United States v. Blair*, 522 F.3d 740, 752 (6th Cir. 2008). However, there is no bright-line or definite time in which a traffic stop must be consummated. Obviously, each stop is different. Here, the stop commenced at 11:29, and at nearly 11:40, Officer Hollis gave defendant the warning citation and returned his driver's license. The eleven minutes that had passed were related to the traffic stop. Almost immediately after the traffic stop commenced,

defendant himself suggested to Officer Hollis that he could check the serial numbers of the two rifles to see if they were stolen, and Officer Hollis merely took defendant up on his offer. That firearms' check required another minute or so. More or less during this same time, Hollis asked defendant for his consent to search the vehicle and, after a very brief discussion, defendant consented. From the commencement of the traffic stop to defendant's consent to search the car, fourteen minutes or less elapsed. Under the totality of the circumstances of this traffic stop, that was not an unreasonable amount of time.

Defendant's primary argument is that Officer Hollis' search of the vehicle exceeded the scope of his consent. In his supplemental motion,[5] defendant states that Officer Hollis found the package of methamphetamine only after he "dismantl[ed] that portion of the car containing the gear box." Defendant then points out that the Supreme Court in *New York v. Belton*, 453 U.S. 454 (1981) held that the passenger compartment of a vehicle and any containers within the arrestee's reach can be searched as an incident to the arrest of someone in that vehicle. He notes that the Sixth Circuit Court of Appeals, in *United States v. Pino*, 855 F.2d 357 (6th Cir. 1988), defined "passenger compartment" for *Belton* purposes as all space within the vehicle that is reachable by any occupant, *excluding areas that would require dismantling the vehicle*. *Id.* , 364. Defendant extrapolates from *Pino* that a consent to search a vehicle does not authorize an officer to go so far as to dismantle it.

Defendant's statement that Officer Hollis dismantled that part of the car containing the "gear box" is inaccurate in two respects; Officer Hollis did not remove the cover to the

[5] Doc. 31.

car's "gear box," and he "dismantled" nothing. What Hollis removed was the plastic cover - "shroud," if you will - that conceals the gear-shift linkage mechanism from view. Such covers are present in virtually every car, certainly those manufactured in the past ten or twenty years. This cover or shroud contained a cup holder, and it had a slit through which the shift lever protruded. These covers can be and frequently are removed when something of value, e.g., a ring, falls into the slit and disappears. To be sure, these covers or shrouds are not intended to be removed on a casual, day-to–day basis. But it is this very fact that is critical to this portion of defendant's motion to suppress. As Hollis was searching the front driver's seat area, and as he looked in a small storage compartment immediately behind the gear shift cover, he discovered that the cover or shroud was extremely loose; indeed, it was not attached at all. That circumstance prompted Hollis to put his fingernail under the edge of the cover and lift upwards, and it easily lifted. Beneath the cover Hollis saw a baseball-sized object wrapped in black electrical tape. After that package was opened, it was found to contain two plastic bags containing a crystalline substance that appeared to be methamphetamine.[6]

In several documents written by Hollis after defendant's arrest, he never mentioned that the cover was loose. For example, in his Affidavit of Complaint filed with the Sessions Court of Washington County,[7] he stated that, "I located underneath the center console an object . . . ." In a Forfeiture Warrant, he stated that he "rose up [sic] the center console of the

---

[6]A field-test performed a few minutes later confirmed that it was methamphetamine.

[7]Ex. 7.

vehicle and observed a black object."[8] In a "Narrative," Hollis wrote that he "located underneath the center console an object . . . .[9] Defendant suggests that these statements somehow indicate that Hollis pried up the console cover, but such a conclusion is completely unwarranted. Officer Hollis did not "dismantle" anything. The cover was already loose because defendant (or someone) had loosened it in order to conceal the methamphetamine placed beneath it. Someone, whether defendant or another person, had thus converted the area beneath this cover into a storage compartment within the ready reach of anyone in the passenger compartment of the car, including defendant. Officer Hollis was not obliged to refrain from looking under this console simply because the cover was something that *ordinarily* would be secured. It was not secured, as Hollis discovered by merely touching it. Lifting it required nothing more than the effort expended by using a forefinger.

Defendant was promptly placed under arrest at 11:49, and at 11:52 he was given his *Miranda* warnings. His person was again searched, and nothing was found. However, the officer who transported defendant to the police station performed a third search, and more methamphetamine was found in one of his pants' pocket. Defendant also gave a statement at the police station which, it is assumed, was incriminating.

Defendant argues that the third search of his person, as well as his statement, were "fruits of the poisonous tree" in the sense of *Wong Sun v. United States*, 371 U.S. 471 (1963). As can be seen in the preceding paragraphs, the tree was not poisonous, as a result of which

---

[8]Ex. 6.

[9]Ex. 5.

there is no basis to suppress the third search of defendant's person, which clearly was incident to his lawful arrest, and his subsequent statement at the police station was both voluntary and made subsequently to the administration of *Miranda* warnings.

Therefore, it is the conclusion of the magistrate judge that (1) the traffic stop was legitimate; (2) the time expended for that traffic stop, under the totality of the circumstances, was not unreasonably long; (3) defendant knowledgeably and voluntarily consented to a search of his vehicle; (4) Officer Hollis' search of the passenger compartment of the vehicle did not exceed the scope of defendant's consent; (5) the methamphetamine concealed in the car was lawfully discovered and seized; (6) defendant was given his *Miranda* warnings; (7) defendant was lawfully arrested as a result of the discovery of the methamphetamine in his car; (8) the methamphetamine found on defendant's person was the result of a search incident to defendant's lawful arrest; and (9) defendant's statement given to the police was voluntary and made after he was appropriately *Mirandized.*

Accordingly, it is respectfully recommended that defendant's motion to suppress (Doc. 22), as supplemented (Doc. 31), be DENIED.[10]

Respectfully submitted,

s/ Dennis H. Inman
United States Magistrate Judge

[10]Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

